STORM AND BEEKMAN *against* WOODS.

*If a creditor cause the goods of his debtor to be seized by a fieri facias, and suffer them afterwards to remain in the possession of the debtor, the execution will be deemed fraudulent and void, as against a subsequent execution. A sheriff seized goods on an execution in favour of A., and by his direction delayed a sale, and left them in the possession of the debtor more than a year, when a second execution, in favour of B. coming to his hands, the sheriff sold the goods on both executions, but refused to pay the proceeds to A., and returned nulla bona to the execution. In an action for a false return, brought by A. against the sheriff, it was held that the first execution was dormant, and must be postponed to the second, and that no action would lie against the sheriff for a false return.*

THIS was an action on the case against the defendant, as late sheriff of *Washington* county, for a *false return* on a *test. fi. fa.* against *Peter Hilton*, at the suit of the plaintiffs.

The declaration contained two counts: the first charged a false return of *nulla bona*, after the defendant had seized and levied on sufficient property of *Hilton* to satisfy the execution. The second count, averring that *Hilton* had sufficient goods, &c. within the bailiwick of the defendant, on which he might and ought to have levied the amount endorsed on the execution, but did not, &c. though he had notice, &c. alleged a *false return* of *nulla bona*, &c.

The cause was tried at the *Albany* circuit, in *October*, 1813, before Mr. Justice *Thompson*. The judgment at the suit of the plaintiff against *Hilton*, for 591 dollars and 29 cents, and 25 dollars and 75 cents costs, was proved; it was docketed on the 24th of *November*, 1806. A *test. fi. fa.* was regularly issued, directed to the defendant, as sheriff, *tested* 14th of *May*, 1807, returnable the 1st *Monday* of *August* next thereafter, on which was endorsed a direction to the sheriff to levy 295 dollars and 64 cents of debt, and the costs, with interest on the debt from the 26th of *July*, 1804, besides his fees. And it was proved that the amount was justly due the plaintiffs. The execution was delivered to the defendant on the 5th of *June*, 1807, and was returned, with *nulla bona* thereon endorsed by the defendant, in *May* term, 1810.

A witness for the plaintiff testified, that after the execution was delivered to the deputy, he, frequently, told the witness that he had levied the execution on the goods of *Hilton*.

In the autumn of 1808 the deputy was directed to sell the goods under the execution, and they were advertised for sale on the 16th of *November*, 1810, under the executions, one of them, as above mentioned, the other issued subsequently, in favour of *John T. Close*. The goods, &c. of *Hilton* sold for 408 dollars and 24 cents.

It appeared that in *September*, 1807, the plaintiffs assigned the judgment against *Hilton* to *A.* and *D. Lane*, who gave direc-

tions to the deputy to sell on the execution.  The goods levied
upon, and sold, consisted of household furniture, and a few dry
goods and farming utensils.  *A. Lane,* who was a witness, hav-
ing assigned his interest to *D. Lane,* testified that *Hilton* had the
goods in his possession, in 1807 and 1808, and kept his store
open, doing business as usual, and had a saw mill, and some
other property; that after the judgment was assigned to *A.* and
*D. Lane,* they sold some goods to *Hilton,* who never paid any
thing afterwards.  The witness thought the circumstances of
*Hilton* doubtful, in 1807; and he had not secured *A.* and *D.
Lane* for their claims; and they, when they took the assignment
of the judgment, knew that *Close* was about to obtain a judgment
against *Hilton.*  The attorney on record for the plaintiffs, wrote
a letter to the deputy sheriff, dated the 10th of *June,* 1807, in
which he requested him to defer the sale of *Hilton's* property
on the execution sent him, which letter was written at the re-
quest of *A.* and *D. Lane,* and forwarded by them to the deputy
sheriff, the 1st of *June,* 1807; and the attorney testified, that he
never countermanded the directions endorsed, nor gave any
other directions, except that contained in his letter of the 10th of
*June,* and when the execution was issued he gave no directions
to the deputy sheriff not to levy the execution, or to indulge
*Hilton.*  The deputy afterwards told the attorney that he had
levied the execution, but the attorney made no inquiry as to the
mode in which it had been done, nor did he give the deputy
any instructions as to the manner of levying the execution.

The deputy sheriff, having been released and sworn as a
witness for the defendant, testified that he received the execu-
tion of the plaintiffs against *Hilton* in *June,* 1807, about eight
or ten days before the attorney's letter of the 10th of *June;*
that he made the seizure before the return day of the execution,
and at that time there was no other execution against *Hilton* in
the sheriff's hands.  The witness received no instructions as to
the mode of proceeding.  The witness levied on *Hilton's*
household furniture and farming utensils, and a few goods he had
in his store; but took no inventory or receipt for them, as he
thought *Hilton* safe, and he should have no difficulty, having
received the attorney's letter; and *Hilton* said the business
would be soon settled.  The execution remained in this situa-
tion until *May,* 1808, when another execution in favour of *Close*
against *Hilton* was received by the sheriff; after which the

NEW-YORK, deputy took an inventory of the goods, &c. and advertised
May, 1814. them for sale on the two executions.  *A. Lane* fixed the day
of sale on the 16th of *November*, 1808, when it took place.
STORM The goods were sold, by consent of *Lane*, who attended, and
v. of the attorney of *Close*, on a credit; and a note for 350 dollars
WOODS. was taken, payable in 18 months, which was afterwards delivered
to *Close*, by the directions of the defendant, who said he was
indemnified by *Close*.  The deputy sheriff never took the goods
into his possession, nor did he take a receipt for them from any
person, under either of the executions.  In *August*, 1808, the
deputy received a letter from *A.* and *D. Lane*, directing him not
to proceed in the sale of *Hilton's* property, under their execu-
tion, unless younger executions pressed him to do so, in which
case he was required to give their execution, being the oldest,
a preference.  In consequence of this letter, as well as the
one received from the attorney of the plaintiff on record, he
delayed the plaintiffs' execution.  Before the sale, he told *Lane*
that the execution of the plaintiff had the preference; for he did
not then know that an execution could lose its priority.

The judge expressing an opinion that the proceedings un-
der the plaintiffs' execution must be deemed fraudulent, and
that the plaintiff had no right to recover, they submitted to a
nonsuit, with liberty to move the court to set it aside, and for a
new trial.

The case was submitted to the court without argument.

*Per Curiam.*  This case comes within the principle laid down
and recognised by this court, in the case of *Whipple* v. *Foot*,
(2 *Johns. Rep.* 422.) that if a creditor seize the goods of his
debtor, on an execution, and suffer them to remain in his hands,
the execution is deemed fraudulent and void, as against a subse-
quent execution.  This rule has been long established in the
*English* courts,(a) and is founded upon reasons best calculated
to prevent fraud.

So far as the facts disclosed at the trial were proper to be
submitted to a jury, they must be understood to have been
found by them.  That the property was left in the possession of

(a) 1 *Wils.* 44.  *Salk.* 720, 721.  1 *Ld. Raym.* 251.  5 *Mod.* 377.  7 *Mod.* 37.
2 *Term Rep.* 287. 596.  1 *Tidd's Prac.* 919, 920.  1 *Esp. Rep.* 205.  1 *Campb. N.*
*P.* 333.

NEW-YORK,
May, 1814.

Storm
v.
Woods.

*Hilton*, the debtor, after the pretended levy of the plaintiffs' execution, is not denied, and that this was known to the assignees of the judgment, and acquiesced in by them, is clearly to be inferred from the case. In this situation the execution was permitted to remain for nearly a year; *Hilton*, the debtor, continuing in the possession of the property, using it as his own, in the same manner as he had previously done, and until the second execution came into the sheriff's hands. Under these circumstances, the first execution ought to be considered as dormant, and postponed in favour of the second.

Whether the sheriff is chargeable or not with neglect of duty, depends upon the fact, whether his conduct was known or approved of by the assignees of the judgment; and whether they knew in what manner the levy had been made, may be questionable; but that they did know that the property was left in the possession of *Hilton*, cannot admit of a doubt. No actual fraud was intended by them. They undoubtedly supposed they could postpone proceedings under their execution, until pressed on by younger ones, and still retain their priority. Motives of humanity might have influenced them to this indulgence; still, it was not warranted by the sound and salutary principles of the common law. The case of *Levy* v. *Wallis*, (4 *Dall.* 167.) decided in the *supreme* court of *Pennsylvania*, which has been referred to, admits the *English* rule to be, as understood and recognised by this court; but, it is said, that sentiments of humanity, and the peculiar necessities of the country, has induced the court in *Pennsylvania*, to depart from it. In that state, however, the soundness of their own rule has been questioned, and much shaken in later cases. (See 4 *Dall.* 168. note (1).) The motion on the part of the defendant must be denied.

Motion denied. (*a*)

(*a*) See *Beals* v. *Guernsey*, (8 *Johns. Rep.* 432.) *Barrow* v. *Paxton*, (& *Johns. Rep.* 258.) *Prec. in Chanc.* 285. *Cowp.* 432. 2 *Bos. & Pull.* 59. 1 *Vern. Rep.* 381. 1 *Pow. on Mort.* 29. (4th edit.)