UTICA,
Aug. 1824.

Rew
v.
Barber.

REW *against* BARBER.   [*Vid. S. C. by the title of Rew* v. *Barker*, 2 *Cowen's Rep.* 508, *where the record was amend-ed as to the time of sale.*]

Where a sheriff levied on a horse under a *fi. fa.* and conveyed him to the plaintiff in the *fi. fa.* who directed him to return the horse to the defendant, which he did, and left him there in the defendant's possession, who sold the horse to R. who sold him to B. who purchased *bona fide,* without notice of the levy, from whom the sheriff took him, and sold him at auction under the execution; the first sale to R. was also *bona fide* and without notice of the levy; in an action by B. against R. upon a breach of the implied warranty of title, *held,* that B. was entitled to recover.

Merely leaving property levied upon in the possession of the defendant in the execution, though with the plaintiff's consent, is not, *per se,* fraudulent, either as against subsequent creditors or purchasers.

Otherwise, where the sheriff is directed to delay the execution or sale.

The acceptance of the note of a 3d person on the sale of a chattel, for the consideration money. is payment.

It is equivalent to the payment of money, and on a failure of title, an action lies for money had and received, to recover the amount of the consideration money and interest.

Assumpsit is the proper form of action, where there is a warranty of title express or implied in the sale of a chattel.

A warranty of title is implied on the sale of a chattel.

ERROR from the Court of Common Pleas of the county of Onondaga. *Barber* sued *Rew*, in the Court below; and declared against him for money lent, and money had and received. Plea, the general issue. The cause was tried at November term, 1819, when the jury found a special verdict as follows: "That on the 19th *November*, 1818, *Rew* (the defendant below) sold a certain brown horse to *Barber*, (the plaintiff below) for $111; and the plaintiff paid him in a note against one *Shankland*, for $130, the defendant giving his note to the plaintiff for the balance; that in the month of *October*, next previous to the sale, *Jabish Castle*, one of the deputies of the Sheriff of *Onondaga*, having a *fi. fa.* for $59, in favor of *Elijah Rust* against *Peter W. Yates*, who then owned the horse in question, came to the house of *Yates*, and levied on the horse; that, at the time of the levy, there were two other horses, two cows, and his library, and farming utensils in the deputy's sight and power. He did not take any inventory of them as levied on; but, considering the horse as sufficient, took him away, and carried him to *Aaron Benedict*, who then bought the execution, and requested him to keep the horse; but directed him to take the horse back and leave him in *Yates'* custody; which he accordingly did. *Yates* soon after sold the horse to the defendant, who purchased him in good faith, without knowledge of the levy. That in the month of *November*, next thereafter, *Castle* received another *fi. fa.* in favor of *Benedict* against *Yates*, which he levied upon all the property of

*Yates*, taking an inventory of it under the second execution. The horse having been previously sold by *Yates*, was not in his possession at the time of the second levy. *Castle* then advertised for sale, all the property levied on by the two executions, generally, without discrimination, and having taken the horse from the plaintiff previous to the day of sale, proceeded to sell the other property first, without reference to any specific execution, until it was exhausted. The sales amounted to several hundred dollars, being enough to satisfy the second execution, and $4 over. He then set up the horse on the first execution, sold him for $54, to one *Daniel Wood*, who bid in behalf of *Benedict*, and delivered him to *Wood*. Both executions were returnable at *November* term, 1818 ; and the second levy was prior to the return day of the first. But whether, &c. and pray, &c. and if, &c. they assess the damages of the plaintiff to $118,77, &c. But if, &c." Judgment for the plaintiff below on the special verdict, whence the defendant below brought error to this Court.

*Talcott*, (Attorney General) for the plaintiff in error. 1. Leaving the horse in *Yates'* possession rendered the levy fraudulent and void against purchasers as well as creditors. Sending the horse back to *Yates* discharged the lien, and his sale to a *bona fide* purchaser conveyed a good title. No doubt there was a valid levy originally ;(a) but it was discontinued. Suffering property levied upon to remain with the debtor is fraudulent and void as against subsequent executions. This is the general rule as recognized in *Whipple* v. *Foot* ;(b) though the removal of a growing crop was excused as being an exception to the rule, founded in necessity. And in *Storm* v. *Woods*,(c) the general rule is laid down and enforced in terms, " that if a creditor seize the goods of his debtor, on an execution, and suffer them to remain in his hands, the execution is deemed fraudulent and void against a subsequent execution. This rule, say the Judges, has been long established in the English Courts,(d) and is founded upon reasons best calculated to prevent fraud." Yet it is not necessary, in this case, to contend that an actual remo-

UTICA,
Aug. 1824.

Rew
v.
Barber.

(a) 2 John.
Rep. 422.

(b) id. 418.
(c) 11 John.
112.
(d) 1 Wils.
44. 1 Salk.
720, 721. 1
Ld. Raymond,
251. 5 Mod.
377. 7 Mod.
37. 2 T. R.
287, 596. 1
Tidd's Pr. 919,
920. 1 Esp.
Rep. 205. 1
Campb. Rep.
333.

UTICA,
Aug. 1824.

Rew
v.
Barber.

val is necessary. The creditor does more to indicate fraud than a mere neglect to remove. After having the property removed, and in the actual custody of the deputy, he relinquishes all control over it, and sends it back to the debtor, as if the execution had been discharged. It was giving *Yates* a false credit, and exciting a confidence, upon the strength of which *Rew* became a purchaser. As such, it comes directly within the

(e) 4 Yeates' Rep. 477, 478-9.

(f) id. 194.

language of the Court in *Knox* v. *Summers* ;(e) and in the previous case of *The Guardians of the Poor of Philadelphia* v. *Lawrence*,(f) the Court decided, that where the plaintiff, or his attorney, deems it necessary to put an officer in the defendant's house, to preserve the lien of an execution, the withdrawing him, and suffering the defendant to go on as usual with his business, is a relinquishment of the execution. The Court admit that, by the practice of *Pennsylvania*, the plaintiff does not lose his lien on a *fi. fa.* by the Sheriff's not removing the goods levied upon, unless their continuance in the defendant's possession led to a false credit, and injured third persons. They say that the practice, however, is different in *England*, which had been adopted by the U. S. Circuit Court for that district ; that it is held, in *England*, that the goods of the defendant must be removed to a place of safe custody, within a reasonable time, otherwise the officer who was placed in the house would become a trespasser ; and that the late practice in the city of *Philadelphia* was the same ; that the plaintiff's attorney having proceeded according to that practice, but withdrawn the officer, this must be deemed a relinquishment of the effect of

(g) 4 Dall. 358.

the execution. In the *United States* v. *Conyngham*,(g) the naked point was decided by the Circuit Court of the *United States*, that leaving goods with the defendant in the execution is fraudulent as to subsequent executions. In *Chancellor* v.

(h) id. 213.

*Philips*,(h) the Supreme Court of *Pennsylvania* decided the very point in question here, admitting it to depend upon a mere neglect to remove the goods. The Sheriff had levied on a kiln of unburnt bricks, and other property, in *June*, 1798, but suffered them to remain in the defendant's possession till *April*, 1799, when, on putting them up for sale, it was found that one of the defendants had sold the bricks to

a *bona fide* purchaser, without notice of the levy. The Sheriff, at the time of the levy, employed a man to call at the brick yard occasionally, but did not keep any person constantly there. On this state of facts, it was decided, that the purchaser should hold the bricks ; although the Court agreed, that a different practice had prevailed and been established in cases of a levy upon household furniture, which might be left with the defendant without prejudice to the levy. The present is certainly a stronger case for the purchaser, as the acts of abandonment are much less equivocal.

2. But if we are wrong in supposing that all lien was lost, we then say that the evidence does not support the declaration. The action was for money lent, and money had and received ; whereas, in fact, no money passed between the parties. But, if otherwise, it is, at least, questionable whether such an action will lie to try the title upon a breach of warranty.

*S. A. Foot*, contra. I am not aware that it can make any difference in principle, whether the horse was returned to *Yates* with or without the consent of the plaintiff in the execution, or his assignee. This is not a litigation between him and the purchaser, or between the Sheriff and the purchaser ; but it is an action by a purchaser, two removes from *Yates*, the defendant in the execution, against the first purchaser, upon the implied warranty of title. The second purchaser, deriving title from *Yates*, buys and takes possession, which possession is divested by the Sheriff, who claims a prior title under *Yates*. We must, then, look to the source whence these two derive their title. Had *Yates* a title, and a right to sell and pass the property to the defendant below? As between *Yates* and the Sheriff, had the former a title? This is the true inquiry ; because the purchaser must always take care as to what right passes by the sale ; and if it fails, he must look to his vendor. If *Yates* had no title, how could he give one to *Rew*, and *Rew* to *Barber* ? The cases cited are all, I presume, where the question raised was directly between the plaintiff in the execution levied, and some third person claiming, as against him, the priority either as

UTICA,
Aug. 1824.

Rew
v.
Barber.

a creditor or purchaser. I agree that where the plaintiff either levies or purchases, and leaves the property remaining in possession of the debtor, he cannot enforce *his* claim directly against third persons.

It is conceded that this was a good levy; and if so, *Yates*, had no right to sell. Whatever the Judges of *Pennsylvania*, or the U. S. Circuit Court of that state, may say upon this question, we have our own settled law as to what shall constitute a levy. It is not material, even at the beginning, that the Sheriff should take the property into his actual possession. If he sees it, and has it within his reach, and under his control, it is enough. This constitutes a levy; and does the law require that the acts of possession should be more distinct and open, in order to continue a levy, than to constitute the levy itself? The mere taking an inventory, without any farther act, would clearly amount to a levy, the Sheriff having the property within his power; or any other act manifesting a mere intention to take it-(i) If the levy was good, it follows, as a necessary consequence, that the Sheriff may afterwards take the property, wherever he can find it. If a levy is good, and good even without actual possession, how can it come to nothing, from the mere want of actual possession? If the levy was good, the argument of the other side fails entirely. At any rate, it is not inquirable between these parties, whether the Sheriff took or retained the property in his actual possession, or not. Is it to be endured, that *Barber*, a purchaser, shall be made accountable for the irregularity of the Sheriff's proceedings? It is enough that these were regular on their face. Is a purchaser bound to examine all the Sheriff's acts in detail? The horse was taken from our possession, and sold for *Yates'* benefit, who was the first vendor. The burthen of the litigation is thrown upon us, and we had the right, on an authority being presented which is regular on its face, or apparently good, to surrender the property, without further inquiry. The vendor is bound to afford the vendee a full indemnity against every claim of title, *prima facie*, good; and all he can exact is, that the vendee should keep the property till a claim is presented apparently fair.

(i) *Haggerty v. Wilber*, 16 *John*. 287.

UTICA, Aug. 1824.

Rew v. Barber.

(j) 11 *John.* 518.
(k) 2 *Esp. Rep.* 571.
(l) *id. ibid.*
*Whitbeck* v. *Van Ness,* 11 *John.* 409.

The case of *Witherby* v. *Mann,*(j) and *Barclay* v. *Goock,*(k) decide that we had a right to treat the note given in consideration, as money. It was received in payment.(l) The consideration having totally failed, it is well settled that we may disaffirm the contract, and bring our action for the consideration money paid.

The *Attorney General,* in reply. The gentleman is certainly mistaken in his doctrine as to the extent of indemnity which the vendor is bound to yield. It is true, that if the vendee gives notice to the vendor, of a suit pending against the former, in which the title is involved, a recovery against him, upon whatever foundation, will render the vendor liable ; but this Court have established no rule by which he is entitled to indemnity for vexatious claims, however plausible. It is a strange doctrine, that the vendee shall be paid the value of the article, by the vendor, merely because the claim upon which he surrenders the property is, *prima facie*, good. Suppose it had appeared that the judgment had been released, a fact which the vendee might not know, but yet he thinks proper to surrender the article sold : how do we stand, within the rule contended for on the other side ? We cannot bring an action for the horse, because we have sold, and have no title. The vendee, alone, can vindicate the true claim ; and if he is protected, in the surrender, by a *prima facie* case, and can recover over against us, we are left without remedy.

The question between these parties must be the same as between any others. If the Sheriff had been sued by *Barber,* for his wrongful act in taking the property, he could not have set up his execution and levy as a defence. The question would be, in that case, as it is here, whether the levy had not been waived ? Suppose the horse had passed through 500 hands, by as many sales : the derivative title of the last vendee must depend upon the very same inquiry as would be pertinent between the plaintiff in the execution and third persons, or between him and the Sheriff, in reference to the rights of third persons. Is the title of a remote vendee to

be assailed, in this manner, by a dormant execution, merely because an ultimate remedy by suit may be had against, perhaps, an insolvent vendor ? The very man who seeks to avoid the sale, is the one who put it in the power of the defendant, the original insolvent vendor, to make the sale. The plaintiff in the execution was a party to the fraud, and comes to avoid the sale in his own wrong.

*Curia*, per WOODWORTH, J. It is found, by the special verdict, that on the 19*th November*, 1818, the defendant in the Court below sold a horse to the plaintiff, and received in payment a note against a third person.

In *October*, previous to the sale, the Sheriff levied on the horse, under an execution in favour of *A. Rust*, against *Peter W. Yates*, the horse then being his, and brought the horse to *Benedict*, who purchased the execution, and directed the Sheriff to return and leave the horse in the custody of *Yates*. *Yates* soon after sold to *Rew*, the plaintiff, who purchased in good faith, without knowledge of the levy. In *November*, the Sheriff received another execution, in favour of *Benedict*, against *Yates*, and levied on all his property. The Sheriff took the horse from *Barber*, and sold under both executions. *Benedict* became the purchaser of the horse.

If the plaintiff's title has failed, he has good cause of action against the defendant. That will depend on the question, whether leaving the horse in the possession of *Yates*, rendered the execution fraudulent ? There was no direction to suspend or delay the execution, or permission to *Yates* to use the property. The case of *Whipple* v. *Foot*, (2 *John*. 416) is relied on, by the plaintiff in error, to shew that the execution was fraudulent. In that case, the Sheriff levied on wheat growing, and several months afterwards, when the wheat was ripe for harvest, cut and carried it away, and sold it at auction. A subsequent execution was issued, and levied on the same wheat, in the sheaf. It was held, that the first execution was not dormant, the Sheriff having taken all the possession of which the nature of the chattel was susceptible ; that it could not be considered as coming within the opera-

tion of the rule, that if a creditor seize the goods of his debtor on execution, and suffer them to remain in his hands, the execution is deemed f audulent and void against a subsequent execution. As the chattel, in that case, could not be removed before harvest, the execution could not be affected by the omission, admitting that the single fact of directing property levied on to remain with the debtor, until sale, would, in general, render it fraudulent. It was not necessary to decide this last point, for the cause did not depend on it. But mere possession by the defendant will not affect the creditor's claim, or give a second execution priority. The cases cited do not support the doctrine to that extent. In *Edwards* v. *Harben*, (2 *D. & E.* 596) it was held. that where an absolute bill of sale was given, and the creditor agrees to leave the goods in possession of the debtor, it is fraudulent against creditors. But this, I apprehend. has no connexion with the question of permitting the goods to remain with the defendant in the execution, after levy, until the day of sale. The case in 7 *Mod.* 37, referred to by the Court,  ⬛⬛⬛⬛: the creditor caused a levy to be made, but would ⬛⬛ Sheriff proceed farther, and suffered the goods to remain in the custody of the debtor. This was held to be a fraudulent execution. and that a second execution might seize the same goods. The ground here evidently was. making use of the execution as a cover, by directing the Sheriff not to proceed; and is in accordance with the cases in our Courts, where executions have been held dormant, in consequence of directions given by the creditor, to delay, and not proceed : but it is no authority to prove, that the mere possession by the debtor will produce the same result, although the sale takes place as early as the return day of the writ, or within a few days after. The broad principle laid down in *Whipple* v. *Foot*, is recognized in *Storm* v. *Woods*, (11 *John.* 110) and would seem to sanction the doctrine contended for; but it must be understood, that when the Court say, " suffering the goods to remain in the hands of the debtor, the possession is deemed fraudulent," that the debtor retains such execution in consequence of instructions by the creditor to delay, or not to proceed on the execution. The subseqent cases show, that

the latter is the ground upon which this doctrine rests. Thus, in *Doty* v. *Turner*, (8 *John.* 20) the plaintiff, by his agent, directed the Sheriff to levy on the property, and informed him, that if it remained in the possession of the defendant, after the levy, the plaintiff would not hold the Sheriff responsible, if it was squandered, and that he need not take a receipt for it. After the levy, he did nothing further, until after the return day, and a second execution delivered, when he sold on both. It was held, that as there was no instruction to delay the execution after the seizure, or to let it sleep in the Sheriff's hands, the first execution did not lose its preference. The decision is founded on this, that there was no direction for delay. The Court put it upon this ground, and observe, " therefore, the case does not come within the rule of the common law recognized in *Whipple* v. *Foot*." All the cases I have met with, proceed on the principle, that the creditor had interfered and directed a delay of sale, and left the goods with the debtor. In every such case, a second execution would have the preference. The Sheriff, rightfully took possession of the horse and sold him, whereby the title of *Barber* failed.

The only remaining question is, whether he has selected the proper form of action. The acceptance of the note of a third person, was payment and satisfaction for the consideration money. (*Whitbeck* v. *Van Ness*, 11 *John.* 409. 2 *Esp. R.* 517.) Assumpsit is the proper form of action, where there is a warranty, express or implied, in the sale of a chattel. (6 *John.* 168.) A warranty of title is implied, (1 *John.* 274.) The consideration upon which money was paid having failed, it may be recovered back under the count for money had and received.

I am of opinion, that the judgment of the Court below be affirmed,

Judgment affirmed.